IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MICHAEL CONLEY,

      Plaintiff,

v.                           Case No. 2:05-cv-00419

JO ANNE B. BARNHART,
Commissioner of Social
Security,

      Defendant.

MEMORANDUM OPINION AND ORDER

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for Supplemental Security Income ("SSI"), under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  This case is presently pending before the court on cross-motions for judgment on the pleadings.  Both parties have consented in writing to a decision by the United States Magistrate Judge. Presently pending before the court are Plaintiff's Motion for Judgment on the Pleadings and Defendant's Brief in Support of Judgment on the Pleadings.

Plaintiff, Michael Conley (hereinafter referred to as "Claimant"), protectively filed an application for SSI on January 17, 2002, alleging disability as of June 7, 1997, due to penile surgery, depression, anxiety, paranoia and bipolar disorder.  (Tr.

at 115-117, 125.)[1]   The claim was denied initially and upon reconsideration.  (Tr. at 16, 88-98.)   On January 13, 2003, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 99.)   Hearings were held before the Honorable Don C. Paris on October 10, 2003 (no testimony taken) and August 14, 2004.  (Tr. at 405-411; 412-448.)   By decision dated November 22, 2004, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 15-24.)   The ALJ's decision became the final decision of the Commissioner on April 21, 2005, when the Appeals Council denied Claimant's request for review.  (Tr. at 6-8.)   On May 19, 2005, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically

---

[1] Claimant had filed two previous applications for SSI.  His June 1997 application was denied by ALJ decision dated October 30, 1998.  (Tr. at 50-67.)  His September 1999 application was denied by decision dated September 18, 2001. (Tr. at 68-84.)  Claimant did not appeal either decision.

In the present case, the ALJ found that there was no basis upon which to reopen the prior applications since Claimant offered no new evidence material to the decisions, and there was no good cause to re-open.  (Tr. at 16.)  Claimant has not challenged the ALJ's decision on this issue.

determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."   42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.   20 C.F.R. § 416.920 (2004).   If an individual is found "not disabled" at any step, further inquiry is unnecessary.   Id. § 416.920(a).   The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.   Id. § 416.920(b).   If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.   Id. § 416.920(c).   If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   Id. § 416.920(d).   If it does, the claimant is found disabled and awarded benefits.   Id.   If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.   Id. § 416.920(e).   By satisfying inquiry four, the claimant establishes a prima facie case of disability.   Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).   The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental

capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2004).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy.  McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 16.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of residual pain status post penile surgery, chronic low back pain, and an organic mental disorder. (Tr. at 17.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 17-18.)  The ALJ then found that Claimant has a residual functional capacity for a range of medium work, reduced by nonexertional limitations.  (Tr. at 21.) Claimant had no past relevant work experience.  (Tr. at 21.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as a laundry worker, kitchen helper, inspector, night watchman, surveillance monitor, and sorter/grader which exist in significant numbers in the national economy.  (Tr. at 22.)  On this basis, benefits were denied.  (Tr. at 15-24.)

4

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In *Blalock v. Richardson*, substantial evidence was defined as

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Cellebreze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was 44 years old at the time of the administrative hearing.  (Tr. at 420.) He holds a high school equivalency (GED) diploma.  (Tr. at 420.) He has no past relevant work experience.

(Tr. at 21, 421-424.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will discuss it further below as necessary.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is erroneous because (1) the ALJ's assessment of his mental impairments was not supported by the opinions of Claimant's treating physicians nor any examining physicians, and was therefore not supported by substantial medical evidence; and (2) the ALJ erred in relying upon the opinions of a medical reviewer whose opinions were inconsistent with the remainder of the record.   (Pl.'s Br. at 3-20.)   In connection with his first argument, Claimant asserts that the ALJ should have adopted the opinions of consultative examiner Elma Bernardo, M.D., whose findings and diagnoses correlated with those of Claimant's treating and examining physicians.   (Pl.'s Br. at 2-3.)   Claimant then alleges that the ALJ erred in finding that Claimant's mental impairment was an "organic mental disorder", when no physician other than reviewing psychologist Stuart Gitlow, M.D. suggested that diagnosis; and further erred in adopting Dr. Gitlow's opinions as to Claimant's functional capacity.   (Pl.'s Br. at 4, 15-16.)

The Commissioner responds that the ALJ's decision was proper

and was supported by substantial medical evidence in all respects. (Def.'s Br. at 11-20.)

At the first hearing, the ALJ expressed a need to develop Claimant's mental health profile beyond the records of his treating physicians, some of which were dated as early as 1998 and 1999. (Tr. at 409-410.) The ALJ ordered a consultative examination to determine Claimant's current mental status. (Tr. at 410-411.) It was agreed that the taking of testimony would be delayed until after this examination, so that all the evidence could be considered at the same time. (Tr. at 412.)

The ALJ selected and Claimant was examined by Elma Bernardo, M.D. on November 18, 2004. (Tr. at 362-364.) Dr. Bernardo wrote a three-page report based on this examination, which noted Claimant's medical history, subjective complaints, and results of his mental status examination. Id. She noted Claimant's affect, attention span, level of cooperation, mood, speech, results of serial 7 subtraction testing, and results of memory testing. She also observed Claimant's intellect, orientation, judgment and insight. Id. Based on these, Dr. Bernardo opined that Claimant suffered from schizoaffective disorder, bipolar type; post-traumatic stress disorder, chronic; and alcohol dependence in complete remission. (Tr. at 362.) She stated that Claimant

> [was] not only experiencing post-traumatic stress problems secondary to his war experiences, but seems to be having a mood problem. The patient at present is under the

7

> care of a psychiatrist and is on a good dose of
> medication.  However, at this time, he seems to
> be very distressed and so I encouraged him to
> call his psychiatrist so that he can be treated
> right or be hospitalized to keep him safe from
> himself.

(Tr. at 364.)

In conjunction with this narrative report, Dr. Bernardo completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form. (Tr. at 366-368.) She opined that Claimant had a poor ability to follow work rules, to relate to co-workers, deal with the public, interact with supervisors, and deal with work stresses. (Tr. at 366.) He had a fair ability to use judgment, function independently, and maintain attention/concentration. Dr. Bernardo opined that Claimant had a fair ability to understand, remember and carry out complex job instructions; and a good ability to understand, remember and carry out both detailed (but not complex) and simple job instructions. (Tr. at 367.) She found that he had a fair ability to maintain personal appearance and to demonstrate reliability, but a poor ability to behave in an emotionally stable manner and to relate predictably in social situations. (Tr. at 367.)

As medical and clinical support for her opinions, Dr. Bernardo made the following remarks: "at the time I saw him he was very volatile and was on a good deal of medication.  I even told him to call his psychiatrist"; "patient was psychotic at the time I saw him"; and "[patient exhibited] poor impulse control." (Tr. at 367-

8

368.)

After receiving Dr. Bernardo's evaluation, the ALJ secured a medical review of records by psychologist Stuart Gitlow, M.D. (Tr. at 370-75; 376-78; 379-81.) The record indicates that the ALJ provided Dr. Gitlow with the complete medical file; however, in his report, Dr. Gitlow made note of only the following records: Exhibit 25F (Dr. Bernardo's consultative examination report); Exhibit 4F (family practice report by R.L. Short, D.O., of 9/17/02, pertaining mainly to Claimant's physical ailments); Exhibit 1F (discharge summary and final psychiatric diagnosis from Claimant's October 1-28, 1999 admission to and treatment at Mildred Mitchell-Bateman (Huntington) Hospital in which he was diagnosed as bipolar, characterized by poor impulsivity, mood swings, and sleep impairment at times); and Exhibit 19F (counselor's discharge summary of February 7-12, 1998 admission to Williamson Appalachian Regional Hospital in which Claimant was diagnosed with an impulse control disorder, psychotic disorder, and polysubstance abuse).

Dr. Gitlow authored one mental assessment form pertaining to the time period when Claimant was abusing alcohol (tr. at 379-81; from 6/7/97 to 12/01) and one pertaining to the period after he ceased alcohol abuse (tr. at 376-78; from 12/01 to present). Dr. Gitlow opined that after cessation of alcohol abuse, Claimant had a good ability to follow work rules, to use judgment, to interact with supervisors, function independently, and maintain

attention/concentration.  (Tr. at 376.)  He opined that Claimant had a fair ability to relate to co-workers, deal with the public, and deal with work stresses.  Id.  Claimant had a fair ability to understand, remember, and carry out all job instructions, including complex instructions.  (Tr. at 377.) His ability to maintain personal appearance and to demonstrate reliability were good.  His ability to behave in an emotionally stable manner and to relate predictably in social situations was fair.  Id. Dr. Gitlow did not cite any objective or clinical findings in support of his opinions on this form. (Tr. at 376-378.)

Dr. Gitlow's narrative report noted Claimant's substance abuse prior to December 2001, significant documentation regarding impulse control difficulties and mood swings prior to that time, a less-than-optimal EEG (performed after a long course of Valium treatment), Claimant's gunshot head injury in 1993 and onset of psychiatric symptoms thereafter.  (Tr. at 374.)  Dr. Gitlow also noted that Claimant had not experienced any extended periods of decompensation and that there were no notes of significant functional deficits in the area of daily living.  He stated that Claimant's concentration was mildly impaired, and his social functioning was moderately impaired.  Dr. Gitlow then stated that "12.02 was considered most applicable after 12/01 but not met due to lack of evidence supporting ongoing impairment." (Tr. at 374.)

At the second hearing, after reviewing Dr. Bernardo's report,

the VE testified that if the restrictions imposed by Dr. Bernardo
or treating physician Antonio Diaz, M.D. were accepted, the
individual could perform no work in the regional or national
economy. (Tr. at 446-447.) The ALJ, however, gave greater weight
to the opinions of Dr. Gitlow, which would not preclude work. (Tr.
at 21, <u>citing</u> tr. at 370-381.)

In weighing the medical evidence, the ALJ stated that
"treatment records establish the [C]laimant's mood has been
relatively stable since January 2002, with only a few recorded
instances of emotional outbursts." (Tr. at 20.) He determined that
Dr. Diaz's opinions were not supported by objective findings, and
were entitled to little weight. (Tr. at 20.) He rejected Dr.
Bernardo's assessment as "based entirely upon the [C]laimant's
subjective complaints rather than objective findings", and therefore
also entitled to little weight. (Tr. at 20.) Meanwhile, he noted
Dr. Gitlow's remark that the treatment record reflected no findings
indicative of extended periods of decompensation or significant
functional deficits in the area of daily living. (Tr. at 19, 20.)
The ALJ stated, without further elaboration, that he gave greater
weight to Dr. Gitlow's opinions as to Claimant's mental functioning
since December 2001. (Tr. at 21.)

Claimant argues that Dr. Bernardo's assessment is more
consistent with the opinions of Claimant's treating psychiatrist,
Dr. Diaz; with those of treating psychologist Sherry Church; with

11

Claimant's diagnoses and mental health treatments in 1998 and 1999;
and with the record as a whole; and that therefore, the ALJ should
have  relied upon Dr. Bernardo's assessment and the opinions of his
treating sources rather than Dr. Gitlow's review. (Pl.'s Br. at 8-9,
<u>citing</u> tr. at 355-358; 384-390; 303, 305, 309.)

> 1.   Opinions of Dr. Diaz and other
>
>      treating sources

Claimant's arguments concerning Dr. Bernardo's opinions must
be preceded by the question of whether the ALJ properly considered
the opinions of Claimant's treating psychiatrists and psychologists.

Dr. Antonio Diaz treated Claimant from January 28, 2002 through
March 17, 2004, with an appointment scheduled thereafter in May,
2004. (Tr. at 344-354; 359-361; 383-389.)  In March, 2003; August,
2003; and in March, 2004, Dr. Diaz indicated that Claimant was
suffering from Intermittent Explosive Disorder. (Tr. at 345, 359,
385.)   While the majority of Dr. Diaz' treatment notes are
illegible, they do reflect that Dr. Diaz maintained Claimant on a
course of regular mental health treatment, including medication,
during this extended period of time.

In addition, Dr. Diaz completed a Medical Assessment of
(Mental) Ability to do Work-Related Activities form on March 21,
2003.  (Tr. at 355-358.) He indicated that Claimant had a poor
ability to follow work rules, relate to co-workers, deal with
public, use judgment, interact with supervisors, deal with work

stresses, function independently, and maintain
attention/concentration. As medical/clinical support for these
findings, Dr. Diaz stated that "[Claimant] has significant
difficulty dealing with other people and stress due to severe
anxiety, depressed mood and irritability with poor anger control.
His anxiety started during childhood." (Tr. at 356.)

Dr. Diaz indicated that Claimant had a poor ability to
understand, remember and carry out any job instructions, simple to
complex. In support of this finding, Dr. Diaz commented that
Claimant "[h]as problems with concentration and short term memory.
His anxiety and depressed mood are major contributing factors to his
cognitive problems." (Tr. at 356-7.) Dr. Diaz opined that Claimant
had a fair ability to maintain personal appearance, but poor ability
to behave in an emotionally stable manner, relate predictably in
social situations, and to demonstrate reliability. Dr. Diaz stated
that "[Claimant] has difficulty dealing with social situations due
to severe anxiety, depressed mood, and anger problems." (Tr. at
357.)

Licensed psychologist Sherry Church, MA, CAS treated Claimant
from December 17, 2001 through April 18, 2002. Her records reflect
that Claimant reported killing his dogs in the past due to his need
to "see blood" to bring him back to reality (January 10, 2002, tr.
at 305); that he "busted up a little bit of furniture" in February,
2002; admitted that in recent years he had destroyed 5 or 6

13

televisions and a coffee table, and killed his beagles by shooting or torturing them (tr. at 304); and that he had "angry spells" for "no reason" in mid-April, 2002, which caused him to avoid people for 1 week "to avoid any problem" (tr. at 303).  Claimant stated at this April 2002 visit that he knew no reason for his feelings of anger, which seemed to be with him "all the time" and not necessarily related to events.  (Tr. at 303.) Earlier treatment notes reflect that Claimant's family was afraid to be around him due to his unpredictable outbursts of anger; his sister would bring him groceries but just leave them on the porch.  (Tr. at 309.)

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  <u>See</u> 20 C.F.R. § 416.927(d)(2)(2004).  Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) it is supported by clinical and laboratory diagnostic techniques and (2) it is not inconsistent with other substantial evidence."  <u>Ward v. Chater</u>, 924 F. Supp. 53, 55 (W.D. Va. 1996); <u>see also</u>, 20 C.F.R. § 416.927(d)(2)(2004).  The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. § 416.927(d)(2)(2004).

In this case, the ALJ rejected Dr. Diaz' opinions because

14

"while the treating psychiatrist supported this assessment by stating the claimant has significant difficulty with social contact due to depression, irritability, and poor anger control, the treatment records show [Claimant's] mood has been relatively stable with very few instances of reported emotional outbursts, and the medical expert opined the treatment record reflected no findings indicative of extended periods of decompensation or significant functional deficits in the area of daily living." (Tr. at 20, citing Exhibit C-17F, C-22F, C-24F, C-27F and C-29F.) The ALJ then stated that "[a]s the treating psychiatrist's opinion is not supported by objective findings, the undersigned has given the same little weight." Id.

The ALJ was in error. Dr. Diaz's opinions are supported by his own clinical observations of Claimant over the course of almost three (3) years. He recorded his observations of Claimant as his rationale for his opinions. (Tr. at 355-357.) The form requests the medical or clinical findings which support the assessment, and specifically designates that mental status examination, behavior, intelligence test results, and symptoms are appropriate indicators. Id. (emphasis added). The regulations provide that medical findings

> consist of symptoms, signs, and laboratory findings. 20 C.F.R. § 416.928 (2004). "Signs" are defined as anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that

indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

Id.

These were exactly the sorts of evidence Dr. Diaz offered to justify his opinions.

In addition, Dr. Diaz's opinions are consistent with the remainder of the record. As discussed above, Dr. Diaz' opinions correlate with those of Ms. Church. They also correlate with the opinions of other recent examiners. For example, Claimant was evaluated by Kathy D. Harvey, D.O., an internist, at the request of the agency on May 20, 2002. (Tr. at 197-203.) Dr. Harvey primarily evaluated Claimant's physical complaints. However, she noted that Claimant complained of anger and anxiety problems, and stated that he heard his dead father speaking to him. (Tr. at 198.) He stated at the time of her examination that he was "always having problems with his nerves...He states that he 'goes out of control' with rage and anger and [has] never been able to control his anger. This problem has led to many fights and confrontations. As a child, he stated he remembers pulling his hair and biting himself during these 'rages'." (Tr. at 198.) Dr. Harvey opined, "this patient is more importantly suffering from major psychiatric problems....I will, however, defer the diagnosis to the psychiatrist....I do not feel

16

this patient is capable of maintaining gainful employment.  More so, from a psychiatric standpoint than a physical one." (Tr. at 201.)

Dr. Diaz's opinions were further consistent with those of Patricia Liming, CFNP, who performed a general physical upon Claimant for WVDHHR on May 27, 2004. (Tr. at 394-395.)  Ms. Liming stated that as of that time, Claimant was unable to work full time at his customary occupation or like work due to "anti-social behavior, anxiety when around people."  She recommended that Claimant undergo a psychiatric consultation.  (Tr. at 395.)

Strangely, despite these opinions, the ALJ expressly cited Ms. Liming's report in support of his finding that Claimant's mood had been "relatively stable" since 2002.  (Tr. at 19.) However, he gave no further discussion of her opinions. The court finds the ALJ's repeated description of Claimant's mood as "relatively stable with very few instances of reported emotional outbursts" to be completely at odds with the above medical evidence from Dr. Diaz, Ms. Church, Dr. Harvey, and Ms. Liming, all of which pertained to the years 2002-2004.

Finally, Dr. Diaz' opinions are consistent with those of DDS examiner R.L. Short, M.D., and other physicians who treated Claimant as early as 1998 and 1999, and who reached similar diagnoses. (Pl.'s Br. at 10-13, citing records of Dr. Edward Yabut, tr. at 313, who diagnosed impulse control disorder and psychotic disorder not otherwise specified; psychiatrist D.H. Webb and psychologist Eric

C. Webb who diagnosed major depression with psychosis and symptoms similar to bipolar disorder in 1998 and 1999, tr. at 268-95, especially 287, 285; licensed psychologist Mark Bowman, who diagnosed schizoaffective disorder, depressed type and staff psychiatrist Dr. Saurabh of Mildred Mitchell-Bateman Hospital who diagnosed bipolar disorder upon Claimant's 1999 hospital admission, tr. at 179-82, 167-169.)

The ALJ failed to comply with the above regulations in this case.  He gave almost no rationale for his rejection of Dr. Diaz's opinions.  His finding that Dr. Diaz's opinions lacked objective support is simply incorrect.  Finally, the ALJ failed to analyze whether Dr. Diaz's opinions were consistent with the remainder of the record.  He did not discuss the opinions of other treating physicians and psychologists pursuant to these factors—indeed, he made little to no mention of them at all, despite his charge to "always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  20 C.F.R. § 416.927(d)(2)(2004).  These errors necessitate remand.

## 2.   Weighing Remaining Medical Evidence

The ALJ stated that Dr. Bernardo's assessment "appears based entirely upon the [C]laimant's subjective complaints rather than objective findings", and stated that accordingly, he gave it little weight. (Tr. at 20.) Meanwhile, the ALJ stated that he gave greater weight to the opinion of reviewing psychiatrist, Dr. Gitlow. (Tr.

18

at 20, 21.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. § 416.927(d)(2004).   These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors.   Id.

Under § 416.927(d)(1), more weight is given to an examiner than to a non-examiner.  Section 416.927(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  Sections 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

The ALJ should have weighed both Dr. Bernardo's and Dr. Gitlow's opinions according to these regulations.  First, he should have recognized and credited Dr. Bernardo as an examining source. Next, he should have considered that her opinions did not lack objective support, but were based upon her own clinical findings during mental status examination, as set forth in her report. Indeed, the medical assessment form itself indicates that the

19

findings of a mental status examination are appropriate medical and clinical findings.  Subsection (2) of the instructions requests the physician to "[i]dentify the particular medical or clinical findings (i.e., <u>mental status examination</u>, <u>behavior</u>, intelligence test results, <u>symptoms</u>) which support your assessment of any limitations."  (Tr. at 366, emphasis added.)

Dr. Bernardo offered just this sort of information.  She stated in no uncertain terms after examining Claimant that she found him "very volatile", that he was "psychotic", and that she in fact recommended he either visit his psychiatrist or submit to hospitalization "to keep him safe from himself."  (Tr. at 364, 367.) Despite these behavioral descriptions from the expert he selected, the ALJ simply dismissed her opinions.

Next, the ALJ should have weighed Dr. Bernardo's opinions against the remainder of the medical records to determine their consistency with the record as a whole.  The ALJ failed to do this. He made no comparison of Dr. Bernardo's opinions with those of Dr. Diaz, Ms. Church, or Dr. Harvey, or with Claimant's mental health records from 1998 and 1999.  Had he done so, the consistency would have been undeniable.

Meanwhile, the ALJ accepted Dr. Gitlow's opinions without requisite scrutiny.  While the ALJ faults Dr. Diaz's and Dr. Bernardo's opinions as lacking objective evidentiary support, Dr. Gitlow's Medical Assessment form offered absolutely no citation to

20

medical evidence supporting his opinions. (Tr. at 376-378.) His narrative report does summarize his findings; however, as stated above, the report cites specifically to only four records:  Dr. Bernardo's report (Exhibit 25); a family practice IME by R.L. Short, D.O. (Exhibit C-4F); a discharge summary from Claimant's 1999 hospitalization for polysubstance abuse, difficulty controlling his rage, and posing a threat to himself and others (Exhibit C-1F, p. 170); and a discharge summary from 1998 in which the Claimant was diagnosed with impulse control disorder, psychotic disorder, and alcohol/marijuana abuse (Exhibit 19F.)

Quite significantly, Dr. Gitlow makes no reference to the years of treatment notes from psychiatrist Dr. Diaz (2002-2004), Dr. Diaz' mental assessment form (2003), Ms. Church's notes (12/01-4/02), or Dr. Harvey's 2002 opinion.  It is unknown why Dr. Gitlow would disregard or ignore such records, or fail to make any mention of them in his report.

Dr. Gitlow commented that "there is no notation of significant functional deficits in the area of daily living.  Concentration appears mildly impaired and social functioning is moderately impaired." (Tr. at 374.)  The report states, "12.02 was considered most applicable after 12/01 *but was not met due to the lack of evidence supporting significant ongoing impairment.*" (Tr. at 374.) However, substantial evidence discussed above indicates that Claimant was struggling significantly with impairments and mental

21

disturbances after 12/01.  Again, this leaves a question as to whether Dr. Gitlow considered the evidence from Dr. Diaz, Ms. Church, or Dr. Harvey.

Nonetheless, based on Dr. Gitlow's statement, the ALJ concluded that Claimant suffered from an organic brain disorder secondary to a history of head trauma.  (Tr. at 19.)  Dr. Gitlow's report stands alone in this diagnosis.  As Claimant indicates, extensive remaining medical evidence suggests that Claimant suffers Intermittent Explosive Disorder and/or Schizoaffective Disorder, Bipolar, as determined by multiple treating and examining psychiatrists and psychologists through the years.

The court notes that in application of the regulations above, the ALJ failed to consider (a) the fact that Dr. Gitlow was a non-examining source, whose opinions are ordinarily entitled to less weight when they differ from supported opinions of examining (and especially treating) physicians; (b) the supportability of Dr. Gitlow's opinions, in that his report only cites to two medical records since 12/01; while omitting any reference to some three (3) years of treatment records of Claimant's treating psychiatrist and notes of his psychologist in 2002, as well as other records reflecting significant ongoing mental health difficulties and treatment; and furthermore appears based at least in part upon a questionable EEG; (tr. at 374); and (c) the consistency of Dr. Gitlow's opinions with the remainder of the record, as previously

22

discussed.

Moreover, the Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967). Dr. Gitlow's opinions, which stand alone and in contradiction to the other evidence of record, do not constitute substantial evidence for the ALJ's finding that Claimant suffered an organic mental disorder, nor for any restrictions purportedly arising therefrom.

Defendant argues that the actual diagnosis designated by the ALJ is of no consequence; that what matters is the functional capacity of Claimant, which the ALJ accurately described in his hypothetical question to the VE. (Def. Br. at 14.) The court disagrees. The VE testified that given the restrictions found by either Dr. Diaz or Dr. Bernardo, the hypothetical individual could perform no work in the regional or national economy. (Tr. at 446-447.) The weighing of these medical opinions was crucial to the outcome of Claimant's case. The ALJ weighed these opinions in contravention of the regulations. Based on these opinions and the remaining evidence of record (excluding Dr. Gitlow's report as a non-examiner), it is plain that the Commissioner failed to sustain

23

her burden of proof at the fifth step of the sequential analysis, to establish that there is substantial gainful activity which Claimant can perform.  The court finds that Claimant is "disabled," within the meaning of the Act.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is not supported by substantial evidence and that Claimant is entitled to Supplemental Security Income benefits.  Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings is **GRANTED**, the  relief requested by Defendant's Brief in Support of Judgment on the Pleadings is **DENIED**, this matter is **REVERSED** and **REMANDED** for computation of past-due benefits and for assessment of whether Claimant is capable of managing his benefits.  This matter is **DISMISSED** from the docket of this court.

The Clerk is instructed to transmit copies of this Memorandum Opinion and Order to counsel of record.

**ENTER** this 19th day of September, 2006.

Mary E. Stanley
United States Magistrate Judge